***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Phillips and the briefs and arguments on appeal. The Full Commission MODIFIES AND AFFIRMS the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in the Pre-Trial Agreement and at the Deputy hearing as:
 STIPULATIONS
1. Stipulated Exhibit #1. A volume of Medical Records, stamped pp. 1-102 pursuant to the pre-trial agreement.
2. Additional medical records as follows: Dr. Rosenbaum notes of 10-8-03 (2 pp), 10-9-03 (2pp), 11-10-03 (2 pp) attached to Rosenbaum deposition; Mountain Neurological Center FCE by Huanne Jackson, PT (4pp) — attached as exhibit to Rosenbaum, Loomis, and Jackson deposition; Dr. Katz note and prescription of 8-7-03; 8-20-03; 9-9-03; 10-6-03; 11-5-03; and handwritten note of 11-5-03 (11 pp), subsequent to the hearing by agreement.
3. Stipulated Exhibit #3. Defendant's responses to plaintiff's first set of interrogatories and first request for production of documents, and defendant's supplemental responses to plaintiff's first set of interrogatories.
4. Stipulated Exhibit #4. A job description "Quarry Plant Operator-Crusher".
5. A Pre-trial Agreement which stipulates and agrees that:
a. The parties are subject to the NC Workers Compensation Act; and
b. At the time of the accident herein described, an employee-employer relationship existed between the named employee and the named employer; and
c. ACE-USA is the carrier on the risk and is correctly named above; and
d. Plaintiff's average weekly wage is $651.89, yielding a compensation rate of $434.16. The parties further agreed that defendant would provide a Form 22 to compute the exact comp rate.
6. The depositions of Daryl Rosenbaum, MD dated 12-10-03; Ralph Loomis, MD dated 12-18-03, and Huanne Jackson, OT, dated 2-12-04 that were received into evidence.
 ***********
Based upon the competent evidence of record, the undersigned makes the following additional:
 FINDINGS OF FACT
1. Defendant operates 5 quarries in Western North Carolina. Defendant hired plaintiff in October of 2001 as a clean up man and bobcat operator for defendant. As of December 2001, he was working as a plant operator. He previously worked for defendant from June 3, 1994 to July 5, 1995. His job description indicated that, as a Quarry Plant Operator/Crusher Operator, plaintiff would batch, crush, or segregate rock, sand and gravel. This material is used for construction. He was required to operate and repair the quarry machinery. The job description further indicated that overtime work may be required, and that the job required traveling to and from plant sites.
2. Plaintiff was required to be at work at 6:30 a.m. The other employees had to arrive by 7 a.m. He usually worked six days per week. He was required to put in overtime in the evening if necessary to maintain the quarry equipment. Plaintiff worked mostly at the Hayesville and Murphy plants. It took at least ninety minutes to get from his home to the Murphy plant, approximately 87 miles; and about 45 minutes to get to the Hayesville plant, approximately 44 miles. He would work at whichever plant that had an accumulation of rock to crush. In addition, plaintiff occasionally had to go to defendant's plant in Franklin, N.C. He went to the Dillsboro, N.C. plant on once.
3. Charles Espirito, defendant's Environmental Health and Safety Director of 26 years testified that Plaintiff's supervisor would advise Plaintiff which plant he was required to work.
4. Defendant let plaintiff continuously use a company truck to go to and from work beginning December of 2001. Beginning in March of 2002, Plaintiff was provided with a plant truck, which he took home from work and brought back to work every day. Plaintiff drove the plant truck among the plants in Murphy, Hayesville and Franklin during the day, wherever he was needed. On occasion, he would be required to transport parts or equipment. His truck contained a welder, welding torches, welding rods, framing square, hammers, small and large bars, plywood, lacing utensils, winches, and rollers and other equipment. Most of the equipment was supplied by the defendant. The truck was used to keep necessary tools in case of breakdown at the plant. Plaintiff testified that if he had to leave the truck at work and take his personal vehicle home he would be delayed getting on the job if he and the truck were needed at a different plant the next day. Leaving the truck at work would not be economical or feasible for either the employer or the plaintiff.
5. Plaintiff testified that to his knowledge, employees with plant trucks had been taking trucks home for the previous 30 years. Other plant operators, as well persons with the same or similar job responsibilities as plaintiff, such as crane operators, welders, mechanics, oilers, and bobcat operators, were allowed to take a plant truck to and from work. Plaintiff considered the use of the company truck an economic benefit incident to his employment contract because it saved him gas money and saved him wear and tear on his personal vehicle.
6. Another employee, Bradford Burns, who was a plant operator for three years beginning in 2000, testified that he was told by his foreman that he could drive the defendant-employer's truck to and from work, and that he used the truck to travel to the Hayesville, Franklin, and Murphy quarries. Sometimes he would be told the prior evening that he would be working at a different plant the next morning.
7. Another witness, Bob Simons, plaintiff's father, who worked for defendant for over 30 years, testified that plant operators had been taking plant trucks home with them every night.
8. Carl Wright, the production manager for defendant, was the supervisor of plaintiff's supervisor. He testified that for 30 years, defendant always permitted plant operators like plaintiff to drive their vehicle home. Wright testified that having the company truck to take to and from work was one of the reasons he worked there. It was understood that you got the truck when you went to work with defendant-employer.
9. Employees were not allowed to make personal use of the trucks. Fuel was provided for the vehicles by defendant-employer.
10. Charles Espirito, an employee of defendant, testified that having his truck to go to and from work constituted a benefit to him.
11. The Commission finds that plant operators have always driven company-provided trucks to and from their home over the previous 25-30 years. Permission has never been withdrawn. This has been a consistent pattern over the previous 25-30 years that gives rise to the inference of a contractual right to employer-provided transportation.
12. In March of 2001 plaintiff, prior to his employment with defendant-employer, was in a motor vehicle accident. He was treated at Angel Medical Center for a scalp laceration and back pain. He further treated at Smoky Mountain Health Care on 28 March 2001 for persistent head pain and on 30 March 2001 for persistent neck pain. Plaintiff was still unable to work due to upper and lower back discomfort. He did not seek any treatment for his head or back after that. After this accident, he went to work roofing houses and slinging plywood.
13. Prior to 3 September 2002 plaintiff had no trouble performing the duties of plant operator, which included lifting up to 100 pounds and repetitive bending and lifting.
14. On 3 September 2002 plaintiff was involved in a one-vehicle accident on US Highway 64 in Clay County, North Carolina while traveling home in a company vehicle. The truck flipped over and slammed him to the ground. His supervisor was aware that plaintiff took the truck home with him.
15. Plaintiff was taken by ambulance to Angel Medical Center in Franklin, North Carolina. It was noted that he had moderate tenderness in the mid-thoracic spine and also moderate tenderness in the lower lumbar spine. X-rays of the cervical and thoracic spine showed no fracture. He was diagnosed with cervical and back strain and was advised to seek treatment with his family doctor.
16. Plaintiff began treatment for back pain with Daryl Rosenbaum, his family doctor. Dr. Rosenbaum issued out of work notes on 10 September 2002, 17 September 2002, 24 September 2002, and 11 October 2002 "until further notice." Dr. Rosenbaum testified that this last note covered him through the time that he saw Dr. Loomis
17. Dr. Rosenbaum consistently noted a significant shift in plaintiff's thoracic spine causing plaintiff's posture and the myofascial areas around the thoracic region to be painful and dysfunctional. Dr. Rosenbaum was of the opinion that the pain was most likely from a muscle origin. Dr. Rosenbaum also stated that the accident was probably a significant contributing factor of his back pain. Plaintiff's pain was secondary to the motor vehicle accident.
18. On 24 October 2002, Dr. Rosenbaum ordered physical therapy for treatment related to the accident.
19. Plaintiff was also referred to Dr. Plemmons. He was seen on 23 October 2002 complaining of "pain between his shoulder blades." Dr. Plemmons indicated that an MRI of the thoracic spine indicated a left-sided T6-7 herniated disk. He consulted with Dr. Hoski, who recommended continued physical therapy, no surgery, and continued follow-up with Dr. Rosenbaum. Dr. Hoski was to be seen if symptoms did not improve.
20. After a month and a half of physical therapy, plaintiff had not improved. Dr. Rosenbaum referred Plaintiff to Dr. Hyman for epidural blocks. These occurred on 20 November 2002, and 11 December 2002. Dr. Hyman diagnosed thoracic facet syndrome and thoracic disc. The epidural blocks were not helpful.
21. Plaintiff treated with Dr. Daniel Katz 7 August 2003 to 5 November 2003. Dr. Katz prescribed pain medication for chronic thoracic pain.
22. Plaintiff was examined by Ralph Loomis, MD, a neurosurgeon, on 22 January 2003. He was complaining of radiating interscapular pain at the T7 level. Dr. Loomis diagnosed a small herniated disk at T6-7. Plaintiff was also seen on 7 September 2003 with mid-back pain radiating around the chest below the armpits. Dr. Loomis ordered a repeat MRI and recommended that the disk be given time to heal without surgery. Dr. Loomis was of the opinion that plaintiff `s back pain was caused by a herniated thoracic 6-7 disk to the left and the disk injury was caused by the 3 September 2002 accident.
23. Plaintiff had an FCE at Mountain Neurological Center on 3 December 2003 that was requested by Plaintiff's attorney. The Examiner found that plaintiff had some functional limitations based on any attempt to elongate his spine, specific in reaching activities. The FCE indicated that Plaintiff was able to perform work in the light physical demand level, with occasional lifting of 25 pounds, 20 pounds frequently, and 15 pounds constantly and no overhead lifting, or climbing when carrying any weight. Manual and/or aquatic therapy was recommended to assist in improving Plaintiff's functional status and decreasing pain.
24. Dr. Loomis agreed with these recommendations for further treatment and the work restrictions.
25. As of the date of the hearing, no physician had released plaintiff to return to work, and Plaintiff has not returned to work.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The contractual duty exception provides that when an employer provides transportation or allowances to cover the cost of transportation, injuries occurring while going to or returning from work are compensable. Hunt v. Tender Loving Care Home Care Agency,153 N.C. App. 266, 569 S.E.2d 675 (2002). Where the cost of transporting employees to and from work is made incident to the contract of employment, compensation benefits have been allowed, Puett v. BahnsonCo. 231 N.C. 711, 58 S.E.2d 633 (1950), Whittington v. Schnierson Sons,255 N.C. 724, 122 S.E.2d 724 (1961). In this case the defendant-employer provided transportation to and from work and the cost of fuel to employees in the plaintiff's position. The contractual duty exception therefore applies in this case and the plaintiff's injury is compensable.
2. Plaintiff sustained a compensable accident while in the course and scope of his employment on 3 September 2002. Plaintiff is entitled to temporary total disability benefits in the amount of $434.16 per week beginning on that date and continuing until he returns to work or further Order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
3. The plaintiff is entitled to have defendants provide for the treatment of Angel Medical Center, Dr. Rosenbaum, Dr. Plemmons, Dr. Hyman, Dr. Fox, Dr. Loomis, physical therapy as ordered by Dr. Rosenbaum, the FCE at Mountain Neurological Center, and any future expenses related to the compensable injury necessary to provide relief or lessen the period of disability. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned makes the following:
 AWARD
1. Defendant shall pay temporary total disability benefits in the amount of $434.16 per week, beginning 3 September 2002 and continuing until plaintiff returns to work or until further Orders of the Industrial Commission.
2. Defendants shall pay for the medical treatment provided by Angel Medical Center, Dr. Rosenbaum, Dr. Plemmons, Dr. Hyman, Dr. Fox, Dr. Loomis, physical therapy as ordered by Dr. Rosenbaum, the FCE at Mountain Neurological Center, as well as any future medical treatment related to the compensable injury necessary to provide relief or lessen the period of disability.
3. An attorney's fee in the amount of 25% of the compensation due plaintiff is hereby approved to be deducted from the lump sum due plaintiff and paid directly to plaintiff's counsel. Thereafter, every fourth check shall be paid directly to plaintiff's counsel.
4. Defendants shall bear the costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER